**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01395-PAB-CYC

TIMOTHY J. CHRISTENSEN,

Plaintiff,

v.

THE BOARD OF TRUSTEES OF METROPOLITAN STATE UNIVERSITY OF DENVER, et al.,

Defendants.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF 52)**

---

Plaintiff Timothy J. Christensen, proceeding pro se, respectfully submits this Response in Opposition to Defendants' Motion to Dismiss Third Amended Complaint, ECF 52.

**PRELIMINARY STATEMENT**

1. Defendants ask the Court to "dismiss each of the claims," Mot. at 3 — but their Motion's merits analysis of Claim Five seeks dismissal of "monetary damages against Defendants McGeehan and Tackett." Mot. at 12. The Third Amended Complaint ("TAC") pleads Claim Five against McGeehan and Martinez, ECF 44 ¶¶ 64–68 — and the Motion's own immunity section agrees. Mot. at 21 ("Defendants McGeehan and Martinez are entitled to qualified immunity on Claim Five"). Defendant Martinez's conduct is addressed once in the Motion's twenty-four pages — a single conclusory sentence, Mot. at 15 — and the immunity section proceeds only by

incorporation. Mot. at 22. A motion directed at the wrong defendant cannot dismiss the claim against the right one.

2. Nor is that the only component the Motion leaves unopposed. Claim Three pleads interference with the exercise of ADA and Section 504 rights as a distinct protection under 42 U.S.C. § 12203(b). ¶ 59. The Motion recites § 12203 only in summarizing the complaint, Mot. at 1, then applies a single "materially adverse action" template to both retaliation claims, Mot. at 16–17, without addressing interference at all. And Claims One through Three seek prospective relief, ¶¶ 47–59; the Motion analyzes the disability claims only as damages claims, Mot. at 12 ("his intentional discrimination claim must be dismissed"), and its official-capacity argument is limited by its own terms to "§ 1983" and Claim Four, Mot. at 15–16. A motion that does not address a pleaded theory or remedy supplies no basis to dismiss it.

3. Nor is the Motion reliable as to what it does engage. Its citations to the record and the pleading require verification before reliance: it misspells Defendant Makley's name ("Makely") in its operative request for dismissal of the official-capacity claims, Mot. at 16; quotes the pleading with words the cited paragraphs do not contain, compare Mot. at 13, 14, 20 with ECF 44 ¶¶ 61, 63, 71; and attributes the quoted phrase "office complained of" to the wrong office, compare Mot. at 20 with ECF 44 ¶¶ 42, 72. Defendants sought and received ten pages beyond this District's limit on the ground that six claims and nine defendants required them. ECF 45, 48. The extra pages were not spent on engagement.

4. What remains is a conventional Rule 12(b)(6) motion against a pleading the Motion itself demonstrates is clear. The Motion calls the TAC so "disjointed" that "one

cannot reasonably determine what claims are being asserted, against whom, or on what factual basis," Mot. at 2 — then accurately summarizes each of the six claims, the defendants against whom each is asserted, and the factual allegations supporting each, with paragraph citations. Mot. at 1–3. A pleading Defendants could describe that precisely is a pleading this Court can rule on. The TAC pleads specific events, on specific dates, by named officials: an Access Center that approved accommodations and then did not respond when notified in writing that they were not being implemented, ¶¶ 21–26; an adjudicator who declined to review the accused student's offered first-person recording and decided on "the video shared by Financial Aid," ¶¶ 28–29; a directive restricting access to a University service that remains operative today, ¶¶ 30, 33–34; and a records process that produced a fee demand and then silence, ¶¶ 35–36 — all declared true under penalty of perjury. TAC at 27.

5. Defendants' own exhibits undercut the Motion's themes: the email on which it pins the assertion that no avenue remained to correct the accommodation failures offers on its face to "re-check" Plaintiff's grades, compare Mot. at 7 with Ex. A at 3. And the Motion is built substantially on the premise that this Court should resolve factual disputes — what Plaintiff's Accommodation Letter requires, what his December 2024 emails show, what weight the conduct adjudicator gave the evidence — in Defendants' favor now. That is not what Rule 12(b)(6) permits. The Motion should be denied.

**LEGAL STANDARD**

6. To survive a Rule 12(b)(6) motion, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in Plaintiff's favor. Hogan v. Winder, 762 F.3d 1096, 1104 (10th Cir. 2014).

7. Because Plaintiff proceeds pro se, the Court construes his pleadings liberally. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). Defendants quote the corollary that a court does not serve as a pro se litigant's attorney, Mot. at 4–5, but never the rule itself. Their own authorities mark the rule's limits: a pro se complaint should not be dismissed for "failure to cite proper legal authority" or "unfamiliarity with pleading requirements." Diversey v. Schmidly, 738 F.3d 1196, 1199 (10th Cir. 2013). The TAC exhibits none of those defects; it identifies each claim, the legal basis for each, the defendants against whom each is asserted, and the supporting allegations, in numbered paragraphs and separately captioned counts. TAC ¶¶ 47–73.

8. The TAC is verified. Plaintiff declared under penalty of perjury under 28 U.S.C. § 1746 that its factual statements made on personal knowledge are true and correct. TAC at 27.

9. Defendants attach two documents (Exs. A, B) and ask the Court to treat them as contradicting the TAC. Mot. at 6–7 & n.3. Their own authority permits consideration of documents "referred to" in the complaint only where they are central and authenticity is undisputed, Berneike v. CitiMortgage, Inc., 708 F.3d 1141, 1146 (10th Cir. 2013) — conditions met here — but the exhibits are considered with the

allegations, not instead of them, and a document defeats an allegation at this stage only when it conclusively refutes it. The Motion recites those qualifiers only in a footnote, Mot. at 6–7 n.3, after omitting them from its statement of the standard, Mot. at 4–5. As shown below, Defendants' exhibits, read in full, support the TAC's allegations — including the two allegations the Motion says they contradict.

## ARGUMENT

### I. The TAC satisfies Rule 8.

10. Defendants' only Rule 8 argument is the two sentences quoted above. Mot. at 2. Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." The TAC is 27 pages, in numbered paragraphs, organized by chronological fact sections (¶¶ 17–46) and separately captioned counts that identify the statute, the theory, the defendants, and the capacity for each claim (¶¶ 47–73). Defendants' own introduction demonstrates compliance: they correctly identify the six claims, the statutory bases, the capacity groupings, and the supporting allegations. Mot. at 1–3. Where a motion's own summary answers its only Rule 8 objection, no further analysis is required.

### II. Claims One and Two state plausible claims for disability discrimination.

11. The elements are not in dispute: Plaintiff must plausibly allege that he (1) is a qualified individual with a disability, (2) was excluded from or denied the benefits of a public entity's programs or otherwise discriminated against, (3) by reason of disability. J.V. v. Albuquerque Pub. Schs., 813 F.3d 1289, 1295 (10th Cir. 2016). For damages, he must plausibly allege deliberate indifference — knowledge plus inaction that is "more

than negligent and involve[s] an element of deliberateness." Id. at 1298; Barber ex rel. Barber v. Colo. Dep't of Revenue, 562 F.3d 1222, 1228–29 (10th Cir. 2009). Defendants do not dispute that Plaintiff is qualified and disabled, that his accommodations were approved, or that the Board receives federal funds. ¶¶ 4, 17, 21–22, 53. And the Motion analyzes Claims One and Two only as damages claims; the TAC expressly seeks prospective relief under both, ¶ 55, to which that standard does not apply. See ¶ 2.

12. One correction: footnote two argues the ADA and Rehabilitation Act do not impose individual liability. Mot. at 6 n.2. The proposition is sound; the target does not exist. The TAC asserts Claims One and Two against the Board of Trustees and the official-capacity Defendants only. ¶¶ 47–55. The individual-capacity claims arise under 42 U.S.C. § 1983, ¶¶ 64–73, and are addressed in Sections III–V below.

**A. The TAC plausibly alleges a failure to accommodate — and Defendants' own exhibits confirm notice and non-enforcement.**

13. The TAC alleges that in EET 3110, Professor Proaño did not implement approved accommodations — late and inaccessible course materials, unannounced quizzes that rendered the approved testing accommodations unusable, and a demand that Plaintiff invoke, instructor-by-instructor, what the Notification Letter already guaranteed — and that the Access Center's Director, on direct written notice from December 2024, did nothing. ¶¶ 23–26. Defendants respond with a timing argument, a document argument, and a cooperation argument. Each fails at this stage.

14. Timing. Defendants contend that "Plaintiff's delay in raising accommodation implementation concerns precluded MSUD's ability to correct them," Mot. at 6,

because his detailed email of December 20, 2024 came "after Plaintiff had already received his final grade," leaving "no avenues left available to correct any issues in the course." Mot. at 6–7. The duty ran from approval, not from complaint: the Notification Letter issued August 12, 2024, before the semester began, instructing faculty that the accommodations are "non-negotiable with the student" and must never be unilaterally denied without consulting the Access Center. Ex. B at 1. The no-avenue premise is refuted by the exhibit itself: the December 20 letter expressly requested reassessment of his grade in light of the accommodation failures, Ex. A at 4–6, and the Motion pins the contrary proposition on a "See" cite to an email that on its face offers an avenue: "If you find any discrepancy in those percentages, let me know and I will re-check them." Ex. A at 3; Mot. at 7.

15. The Letter itself contemplates post-semester correction for "extenuating circumstances." Ex. B at 1, 3. And the University has itself demonstrated that post-grade correction exists and functions: after independent faculty review, it changed Plaintiff's Spring 2026 PHY-4921 grade to an "A." ¶ 19.

16. Their authority is a summary-judgment employment case in which the plaintiff never told the employer the accommodation was insufficient; the University here was told in writing, twice in five days, with the Access Center's Director copied by name. Ex. A at 1–6; ¶ 24; McFarland v. City & Cnty. of Denver, No. 15-cv-01258-KMT, 2017 WL 3872639, at *7 (D. Colo. Sept. 5, 2017). Delay is not an element of a failure-to-accommodate claim, and Defendants' own summary concedes Plaintiff "notified the instructor and the Access Center of these issues…, but they were not corrected." Mot. at 3.

17. The standard. Defendants frame failure-to-accommodate as request-plus-refusal, citing Norwood's summary-judgment prima facie framework. Mot. at 6 (citing Norwood v. United Parcel Serv., Inc., 57 F.4th 779, 786 (10th Cir. 2023)). At this stage Plaintiff need only plausibly allege the elements, and both are pleaded: the request was made — and granted — through the University's own process, ¶¶ 21–22; Ex. B, and the refusal is the pleaded non-implementation and non-enforcement after written notice to the very office the University's own letter designates for enforcement. ¶¶ 23–26; Ex. B at 1, 3.

18. The documents. Defendants argue the Accommodation Letter covers only "any PowerPoint slides used" and contains no advance-quiz-notice accommodation, so "Plaintiff has not plausibly alleged that he was denied an accommodation." Mot. at 7–8.

19. First, the TAC alleges the approved accommodations "included advance access to course materials in an accessible, digitally usable format; advance notice for quizzes and examinations; extended time; and a designated testing environment," ¶ 22, and that Proaño "did not give the advance notice for quizzes and examinations that Plaintiff's accommodations required." ¶ 23. Where a document's text and the allegations are in tension, the pleader's plausible reading controls; the letter is silent on notice, and silence does not conclusively refute the allegation.

20. Second, the letter's exam accommodations all presuppose that Plaintiff knows an assessment is coming: extended time, a private space, a break, and an enlarged copy, each delivered in the Access Center Testing Location. Ex. B at 1, 3. None can operate for a quiz announced only as it begins. The TAC alleges the manner

of administration made the approved accommodations unusable, ¶ 23 — a plausible denial of an approved accommodation, not a demand for a new one.

21. Third, the renegotiation allegation is corroborated by Defendants' own exhibit. The letter forbids unilateral re-adjudication, Ex. B at 1, 3 ("never unilaterally deny an accommodation without first consulting with the Access Center"), and directs instructors for online assessments to "automatically add the student's approved additional time." Id. Proaño's December 24 email takes the opposite position — for "the ones in-class, it is required for you to ask the instructor," Ex. A at 1 — inventing a precondition the letter does not contain, asserting that "a particular accommodation fits an activity, sometime does not apply to a particular class activity," and conceding he never involved the Access Center. Ex. A at 1–2.

22. *Non-enforcement and deliberate indifference.* The Motion devotes a paragraph to the deliberate-indifference standard and a single sentence to applying it: "even viewing the allegations in Plaintiff's favor, he does not plausibly allege that MSUD failed to act to protect his rights." Mot. at 8. That sentence engages no pleaded fact and addresses only the failure-to-act prong — it does not dispute knowledge. The TAC pleads both prongs with particularity: knowledge — two written notices within five days, the Access Center's Director copied by name, ¶¶ 24–25; Ex. A at 1–6, including the report that the professor "did not respond to them as well," Ex. A at 3 (P.S.); and inaction — the Director "did not intervene to enforce Plaintiff's accommodations, did not correct the renegotiation demand, and did not initiate the reporting or response procedures that University policy requires." ¶ 25; see ¶ 26.

23. The only Access Center communications in Defendants' exhibit are automated holiday and out-of-office replies. Ex. A at 7–8. Their lead authority shows what defeats deliberate indifference: in Barber, the entity engaged at the senior level, offered an objectively reasonable alternative, and obtained a swift legislative amendment. 562 F.3d at 1229–31. The TAC alleges the mirror image — no response, no alternative, no remediation, ¶¶ 24–26 — and both Barber and J.V. were decided on summary-judgment records; whether inaction was "more than negligent" is a fact question not resolved against a pleader.

24. Defendants' own authorities state the rule this pleading satisfies: they acknowledge the obligation to maintain complaint procedures, Mot. at 9 (citing 34 C.F.R. § 104.7(b)), and that "a school's failure to investigate or take other action on discrimination complaints constitutes evidence of deliberate indifference," id. (citing Dorsey on behalf of J.D. v. Pueblo Sch. Dist. 60, 215 F. Supp. 3d 1082, 1089 (D. Colo. 2016)). Murrell v. Sch. Dist. No. 1, Denver — decided, like this case, on a motion to dismiss — reversed dismissal where the complaint alleged actual knowledge and a "complete refusal to investigate known claims." 186 F.3d 1238, 1247–48 (10th Cir. 1999). The TAC alleges exactly that as to the 2024 accommodation failures. ¶¶ 24–26.

**B. The Financial-Aid Directive and records-access allegations are components of a pleaded sequence, not standalone theories.**

25. The Motion isolates the Financial-Aid Directive and the CORA episode and asserts that the TAC does not allege the directive "was issued because of Plaintiff's disability." Mot. at 8–9. That attacks theories the TAC does not advance. The directive is pleaded as one component of an aggregate denial of equal access, ¶ 50, under

elements containing no comparator requirement, Mot. at 6 (citing J.V., 813 F.3d at 1295) — and it is not a closed 2024 episode: the TAC pleads it was never rescinded, that McGeehan personally administered it as late as December 15, 2025, and that it "presently chills and constrains Plaintiff's access to a University service." ¶¶ 33–34. The Motion's intent frame likewise does not reach the request for prospective relief — rescission or clarification "so that ordinary use of the Financial Aid service is not a sanctionable act." ¶ 63.

26. As to records: the Motion defends the CORA fee's legality, Mot. at 9 — a proposition the TAC nowhere contests. Paragraphs 35–36 allege with dates that Plaintiff asked the University to identify an accessible process for records requests and it "did not meaningfully identify an accessible process, accommodation contact, or safe route," ¶ 35; and that when he sought clarification of the fee demand and the search's reliability, the University "stated that no further communication would be forthcoming and treated the requests as closed." ¶ 36. Defendants' own summary concedes the operative fact: the University "ceased communications after he requested clarification." Mot. at 3.

27. *The complaint-process allegations.* Recasting ¶¶ 38–43 as four "efforts to address Plaintiff's 2026 complaints," Mot. at 9, substitutes the Motion's descriptions for the pleaded ones. The TAC alleges: transmission of his complaint materials and disability-related information to an outside investigative firm without adequate advance disclosure of the investigator's status, scope-setting, or conflict screening, ¶ 38; disclosure of his specific diagnosis, with an interpretive gloss and without consent, in the Position Statement filed in the administrative proceeding arising from his own

complaint — while a third-party classmate's identifying information was redacted in the same document, ¶ 39; foreclosure — the OEO as Plaintiff's "sole contact," with "no additional correspondence from this office," ¶ 41 — routing his petition for neutral oversight back into the structure he alleged was implicated, ¶ 40; and unauthorized acquisition of the protected escalation by the head of the office complained of, followed by direct outreach referencing it, ¶¶ 42–43.

28. The Motion answers that "MSUD's attempts to investigate and address Plaintiff's concerns appear to be the very basis for his discrimination claims," Mot. at 9. The framing is inverted. The claims rest on the 2024 accommodation failures and the ensuing non-enforcement, ¶¶ 21–26, 50; the 2026 events are pleaded as the continuation of that indifference and as interference with protected activity, ¶¶ 38–43, 58. A response that is itself "clearly unreasonable in light of the known circumstances" does not defeat deliberate indifference — it is evidence of it. Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 648–49 (1999).

29. And the objections were notice: Plaintiff formally objected in writing on March 6, 2026, ¶ 43; the University answered on March 9 with the foreclosure triad. ¶¶ 40–41. Attempts that begin more than a year after written notice, routed through the offices complained of, over the complainant's documented objections, are not "the opposite" of deliberate indifference.

30. Nor do the Motion's closing tests fit the claims pleaded: deliberate indifference turns on knowledge and inaction, not motive or comparators, Barber, 562 F.3d at 1228 — and the no-differential-treatment assertion overlooks the comparator pleaded in the same document. ¶ 39.

31. Constructive withdrawal and the completion path. The Motion isolates the "final inciting incident" and finds no link to disability, Mot. at 11 — but a final incident presupposes the prior ones, and the TAC pleads the withdrawal as the aggregate's product: "caused by disability-access failures, unsafe process access, unresolved records barriers, retaliation and interference, and the absence of a reliable completion path — not a voluntary abandonment of his education." ¶ 46. The incident itself is pleaded with facts: the posted course description permitted "a literature search on a topic of current physics," while the instructor demanded original research, experiments, or simulations — expectations "narrower than the posted description, at the final stage of the semester," in a course "in which Plaintiff's accommodations were active," ¶¶ 44–45 — and independent faculty review later changed the grade to an "A." ¶¶ 19, 45.

32. The professed confusion over the completion-path relief, Mot. at 11, is likewise manufactured: Plaintiff "remains an enrolled MSU Denver student" carrying three "active, University-controlled course Incompletes," each "open and completable," ¶ 18; and the University's "present control over Plaintiff's grades, Incompletes, transcript, academic standing, records access, and completion pathways" continues to govern whether he can complete his degree and matriculate at the University of Colorado, where he has been admitted for the Fall 2026 term. ¶ 20.

**C. The disclosure allegations are pleaded as part of the pattern — with a built-in comparator.**

33. Defendants cite Kelleher v. Town of Brookfield, No. CV 25-40071-BEM, 2026 WL 91849 (D. Mass. Jan. 5, 2026), for the proposition that Title II and Section 504

contain no freestanding disclosure prohibition. Mot. at 10. No claim depends on one. The TAC pleads the two conveyances, ¶¶ 38–39, as components of the access-denial and interference pattern — and the second carries a comparator in the same document: the University spelled out Plaintiff's diagnosis while redacting a third-party classmate's identifying information, so "a less-restrictive alternative was demonstrably available and used for a third party." ¶ 39. Protecting a non-complaining third party's information while exposing the complainant's, in his own discrimination proceeding, plausibly treats a disabled complainant differently because he complained. The justification offered — that Plaintiff "put in issue his disability status," Mot. at 11 — is refuted on the same documentary face: putting one's disability status at issue is not consent to disclosure of a specific diagnosis, and Defendants' own filing demonstrates the narrower course was available and used. ¶ 39. Kelleher addresses neither comparators nor retaliation framing.

**D. Academic deference does not bar the requested prospective relief.**

34. Ewing's deference attaches to the substance of "genuinely academic" decisions. Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985); Mot. at 12. The relief Plaintiff seeks requires no academic judgment at all: preservation of academic status; an accessible completion path for three University-controlled Incompletes, each pleaded to be "open and completable," ¶ 18; and process relief. Defendants' remaining authority makes the point for them: W.-Helmle v. Denver Dist. Att'ys Off., No. 19-CV-02304-RM-STV, 2020 WL 6119524, at *11 (D. Colo. May 29, 2020), arose from a law-school externship in which the disability claims failed at the threshold — the plaintiff never plausibly tied his impairments to a substantially limited major life activity,

and he was held not to be an employee — aff'd on those grounds, No. 24-1340, 2025 WL 2317368 (10th Cir. Aug. 12, 2025) (unpublished). No approved-accommodation enforcement duty of the kind pleaded here was at issue. Here, the accommodations were approved in writing before the semester began, Ex. B at 1, and their enforcement was requested in writing. Ex. A at 1–6; ¶¶ 21–26. Deference does not convert a university's administrative control over deadlines and completion paths into immunity from Title II's enforcement.

35. The section's closing sentence — that Plaintiff's "intentional discrimination claim must be dismissed," Mot. at 12 — confirms the architecture described at ¶ 2: one damages theory, where the claims pleaded are denial of equal access and failure to accommodate, seeking damages and prospective relief. ¶¶ 47–55. A motion that does not engage the claims pleaded cannot carry them.

**III. Claims Four and Five state plausible procedural due process claims.**

36. A threshold misidentification. As shown at ¶ 1, the Motion's due-process section analyzes Claim Five as a claim for "monetary damages against Defendants McGeehan and Tackett in their individual capacities," Mot. at 12 (citing ¶¶ 64–68) — a defendant pair the claim does not contain. The error is not cosmetic: any due-process analysis of Claim Five must answer Martinez's ratification — affirming that "the video evidence was considered" without identifying which video or addressing that only the accuser's recording had been reviewed, ¶¶ 32, 67 — or it has not tested the claim at all. A motion that does not identify the claim does not test it.

**A. Plaintiff pleads protected interests.**

37. Defendants reduce Plaintiff's interest to "interacting with the Financial Aid representative of his choosing." Mot. at 13–14. The TAC pleads protected interests "in accurate academic records, in non-punitive treatment of his disability-related constructive withdrawal, and in continued access to public educational programs and services." ¶ 61. And it pleads that the conduct case produced a disciplinary record and a mandatory, enforceable directive whose violation is pre-attached to escalation "up to suspension or expulsion" — still operative, still administered by the same official more than a year later. ¶¶ 30, 33–34, 68. Defendants concede the directive "has never been rescinded." Mot. at 2. A public university student has a protected interest in continued enrollment and in not being disciplined without due process. Goss v. Lopez, 419 U.S. 565, 581 (1975); Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1181 (10th Cir. 2001).

**B. The process pleaded was constitutionally inadequate.**

38. The TAC's core allegation is not that McGeehan weighed the evidence wrongly. It is that Plaintiff "offered to show his own first-person audio/video recording of the underlying Financial Aid interaction and requested that McGeehan review it; McGeehan declined to do so and proceeded to decide the matter." ¶ 28. The decision rested on "the video shared by Financial Aid" — the accuser's submission — and "identifies only the accuser's video and makes no reference to Plaintiff's offered first-person recording." ¶ 29.

39. The framework is again Defendants' own: notice of the charges and an opportunity to present one's side. Mot. at 14 (citing Goss, 419 U.S. at 579, 581; Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985)). Plaintiff does not

demand a full evidentiary hearing; "something less" suffices. Loudermill, 470 U.S. at 545. But a process that declines the accused's own first-person recording of the incident and rests on the accusing office's submission alone is not something less than a full hearing — it is something less than an opportunity to be heard.

40. The Motion answers a different allegation: it says "relying on witness statements from Plaintiff and his accusers, as well as video evidence of the incident provided by financial aid staff, hardly amounts to a refusal to consider 'material exculpatory evidence,'" Mot. at 15, and that decisionmakers need not view "the consideration and weight to be afforded certain evidence the same way as Plaintiff." Id. But Plaintiff does not allege a weight dispute; he alleges a refusal to review — and the Motion itself says so, correctly stating the allegation in its introduction ("declined to review Plaintiff's recording of the incident and relied solely on the accuser's video," Mot. at 2) before recasting it in its argument as a dispute about "consideration and weight," Mot. at 15. The two characterizations cannot both be true, and only the first responds to the pleading. Notably, the decision found Plaintiff not responsible for the disruption charge — the one charge tied to actual obstruction — while imposing the directive on the remaining charge. ¶ 29.

41. The appeal compounded rather than cured the defect. Presented with an appeal whose first ground was that the video evidence had not been considered, the appeal officer concluded she "understood the video evidence was considered" — a premise that cannot be squared with a decision letter identifying only the accuser's video — without conducting the independent review the appeal criteria required. ¶¶ 31–32, 67. The Motion's "separate hearing officer" framing, Mot. at 14, carries no

weight: separate is not independent, and the officer was an administrator assigned to this case. ¶ 11.

**C. Claim Four's official-capacity defendants are the officials with authority over the relief sought.**

42. Defendants argue that Davidson, Makley, Ranta-Curran, and Sanders "cannot grant Plaintiff's requested relief." Mot. at 15–16. The Motion's own authorities frame the inquiry differently: official-capacity suits are "permitted where the plaintiff 'seek[s] to enjoin alleged ongoing violations of federal law,'" Peterson v. Martinez, 707 F.3d 1197, 1205 (10th Cir. 2013), and the operative test is whether the named official has "some connection with the enforcement of the act." Ex parte Young, 209 U.S. 123, 157 (1928); accord Kitchen v. Herbert, 755 F.3d 1193, 1201 (10th Cir. 2014). The Motion's competing formulation — "[o]nly officials with authority to grant the requested relief should be named," Mot. at 16 — is drawn from a non-binding district decision cited with a "See" signal. A university cannot designate an office as the sole channel while maintaining its director has no connection to relief concerning it. If the Court concludes any named official is not the proper party for any item of relief, the remedy is substitution or leave to amend, not dismissal. Fed. R. Civ. P. 15(a)(2), 21.

43. Finally, the Motion's official-capacity section is limited by its own terms to "§ 1983" and Claim Four, Mot. at 15–16; the prospective relief sought under Claims One through Three, ¶¶ 47–59, is unopposed. See ¶ 2.

**IV. Claims Three and Six state plausible retaliation claims.**

44. The Motion concedes the predicate: "Solely for the purpose of this motion, Defendants do not deny the identified conduct constitutes protected activity." Mot. at

17 n.4. The identified conduct includes requesting accommodations, reporting their failure, seeking records, filing civil-rights complaints, filing this federal action, and petitioning the President's Office. ¶¶ 57, 70. The live disputes are adversity and causation (Claim Three) and chill and motivation (Claim Six). Two framing errors follow. First, the Motion subjects both claims to a single "materially adverse action" template, Mot. at 16–17 — but a First Amendment retaliation claim asks whether the action would chill or silence "a person of ordinary firmness," a different and more protective threshold the Motion itself states when it reaches Claim Six. Mot. at 19 (quoting Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)). Second, Claim Three pleads interference as well as retaliation, ¶ 59; 42 U.S.C. § 12203(b) — a theory the Motion's single template never addresses. See ¶ 2.

**A. Claim Three (ADA/§ 504 retaliation and interference).**

45. The TAC pleads protected activity (¶ 57) followed by concrete pleaded responses: records access restricted, delayed, then closed after a fee demand and a refusal of further communication (¶¶ 35–36, 58); his protected disability information disclosed against him in the proceeding arising from his own complaint, while a third party's information was redacted in the same document (¶¶ 39, 58); and complaint channels rendered more unsafe and less accessible, including a written directive that the office Plaintiff alleged was implicated was his "sole contact" and that "there will be no additional correspondence" (¶¶ 41, 58–59).

46. Adversity. The standard is whether the action "well might have dissuaded a reasonable [student] from making or supporting a charge of discrimination." Mot. at 17. The phrase is Burlington Northern's, 548 U.S. 53, 68–69 (2006), which reaches acts not

affecting the plaintiff's status at all; the Motion's competing gloss — that the action must "significantly impact a student's status," Mot. at 17–18 — is conceded to be out-of-circuit and cannot narrow the Supreme Court standard its own lead citation applies. The Motion's own footnote examples refute its conclusion: failing grades and exclusion from a program are materially adverse. Mot. at 18 n.5. The TAC pleads consequences of that order: a disciplinary directive whose violation is pre-attached to suspension or expulsion, ¶¶ 30, 33–34; grade consequences already in motion, ¶¶ 18–19; closure of the records channel after he sought records related to his complaints, ¶¶ 35–36; disclosure of his diagnosis with a built-in comparator, ¶ 39; and constructive withdrawal, ¶¶ 44–46, 55. Whether that sequence "well might have dissuaded" is a contextual question not answerable against the pleader on the pleadings.

47. The Motion then asks how "Plaintiff's complaint to the President's Office being redirected to the OEO, or the Dean of Students contacting him to discuss the complaint, were materially adverse." Mot. at 18. The question re-describes the conduct in its most anodyne form and then measures the description. The pleading alleges a written directive making that office Plaintiff's "sole contact" and foreclosing further correspondence, ¶ 41 — issued after his written March 6 objection and a documented physician's warning, ¶ 40 — followed by direct, unsolicited contact from the head of the office complained of, referencing the confidential communication, ¶¶ 42–43. What the sequence communicates is that no channel of complaint exists that will not be returned to the office complained of. ¶ 43. And the Motion's verb gives the posture away: the TAC need not "demonstrate" dissuasion, Mot. at 18; it must plausibly allege it, and ¶ 58 does so in terms.

48. Knowledge and causation. The Motion recasts the third element as proof that the actions were "motivated by Plaintiff's protected activities," Mot. at 17; the element is a causal connection, which may be inferred from "protected conduct closely followed by adverse action." Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ., 595 F.3d 1126, 1131, 1134 (10th Cir. 2010). The pleaded proximity is measured in days: the March 5–6 escalation was answered by the Chief of Staff's March 9 written directive, ¶¶ 40–41, and the Dean of Students' outreach came "[s]hortly after," ¶ 42.

49. Interference. Section 12203(b)'s interference prohibition is a distinct protection. The TAC pleads that Defendants interfered with his exercise of ADA and Section 504 rights by failing to provide safe, accessible, non-retaliatory pathways for accommodation, records access, complaint participation, and academic completion. ¶ 59. The Motion does not address it. See ¶ 2.

**B. Claim Six (First Amendment retaliation — Brown and Tackett).**

50. The TAC pleads that Plaintiff petitioned the President's Office in writing for redress and neutral oversight (¶¶ 40, 70); that Brown, who personally received the petition, responded in writing by redirecting him into the very structure the petition alleged was implicated, declaring that structure his "sole contact," and foreclosing further correspondence (¶¶ 40–41, 71) — a directive Defendants' own motion describes the same way, Mot. at 3; and that Tackett — the head of the office the petition complained of — then made direct, unsolicited contact referencing the protected communication (¶¶ 42–43, 72). The pleaded injury is the retaliatory structure itself: a student who petitions senior leadership about an office's conduct is answered

by that office, in writing and in person, demonstrating that no channel of complaint exists that will not be returned to the office complained of. ¶¶ 43, 72–73.

51. Defendants call this "responsiveness." Mot. at 21. First Amendment doctrine measures injury by what would chill a person of ordinary firmness — and the Tenth Circuit has squarely held that retaliatory responses to a university student's protected speech state a claim. Thompson v. Ragland, 23 F.4th 1252, 1257–59 (10th Cir. 2022); see Worrell, 219 F.3d at 1212 (their own case) (injury inquiry is contextual, not categorical). The petition answered this way was not abstract: it documented, with a physician's warning to the University, that the ongoing administrative actions had already produced a hypertensive crisis requiring hospitalization. ¶ 40. A written declaration that the office alleged to be implicated is a petitioner's "sole" channel — coupled with the complained-of office head's immediate personal outreach referencing the protected petition — would chill a person of ordinary firmness from petitioning again. ¶ 73.

52. *Motive and injury.* The Motion's own noun supplies the connection it disputes: it calls the challenged acts "responses to his petition," Mot. at 19, and a response is connected to its predicate by definition. Motive is pleaded by sequence and content, ¶¶ 40–43, 71–73: the response cannot be described without reference to the petition's content. Content-based motivation is factual, not conclusory. Nor is the injury attack — two words from ¶ 73, "suffered injury" — a fair reading of the paragraph, which alleges that "[e]ach Defendant's action would chill a person of ordinary firmness from continuing to petition for redress," ¶ 73, and describes the injury's nature: "no internal channel existed to seek oversight without the concern

being returned to the office complained of," ¶ 72; see ¶ 43. In a First Amendment claim the injury is the deterrence itself, Worrell, 219 F.3d at 1212; it is not graded by "nature and extent," Mot. at 19, and the ordinary-firmness test is objective and prospective — it asks what the action "would" do, not what it did to this plaintiff. Its authorities do not advance it: consequences are pleaded, ¶¶ 41–43, 72–73, and Hedquist v. Beamer, 763 F. App'x 705, 712 (10th Cir. 2019), is unpublished.

**V. Qualified immunity does not warrant dismissal.**

53. Defendants' qualified-immunity argument depends on misdefining the rights at stake: "a protected interest in speaking with the financial aid representative of his choosing," a requirement "to consider evidence proffered by an accused student to be exculpatory," and a right against "redirecting or initiating contact about a student's complaint." Mot. at 23–24. Those are not the rights Plaintiff pleads. Three opening features warrant note. First, the immunity section itself names "McGeehan and Martinez," Mot. at 21 — the merits section's Tackett-for-Martinez substitution was not carried through. Second, the no-violation incorporation cannot run to Martinez at all: the merits section addresses her conduct in a single conclusory sentence that asserts, without analysis, that her "purported finding" does not "rise to the level of a procedural due process violation." Mot. at 15. An immunity defense that does not engage the defendant's conduct does not resolve the claim against that defendant. Third, the assertion that Plaintiff "cannot establish that his claim involves a protected interest," Mot. at 21, contradicts the Motion's own merits concession. Mot. at 14.

54. The first-prong application confirms it: the Motion argues, "for the reasons set forth above in Section II," that neither "McGeehan or Martinez violated [Plaintiff's] due process rights," Mot. at 22 — and Section II addresses her conduct in a single conclusory sentence, Mot. at 15. The Motion calls its failure-to-state-a-claim and qualified-immunity arguments "inextricably intertwined," Mot. at 23 — its own authority does not: the cited pages recognize only that the two arguments can be similar, "sometimes exceedingly so," while holding qualified immunity "conceptually distinct from the merits of the plaintiff's claim." Montoya v. Vigil, 898 F.3d 1056, 1064–65 (10th Cir. 2018) (quoting Mitchell v. Forsyth, 472 U.S. 511, 527–28 (1985)). Taking the Motion at its word, the pleading-sufficiency answers above are the first-prong answers as well — and on its own authority, the incorporation cannot supply an analysis of Martinez's conduct that exists nowhere.

55. Defined correctly, the rights are elementary and clearly established: a student facing discipline is entitled to an adjudicator who does not refuse to review the student's own proffered first-person evidence and then decide on the accuser's submission alone, Goss, 419 U.S. at 581; Gossett, 245 F.3d at 1181; and a public official may not retaliate against protected petitioning — clearly established in this Circuit, in a case against this University's own student-conduct office, since at least Thompson v. Ragland, 23 F.4th 1252 (10th Cir. 2022), which reversed the dismissal of an MSU Denver student's First Amendment claim on qualified-immunity grounds.

56. Accepting the TAC's allegations — a refused recording, an appeal affirmed on a mistaken premise, a petition answered by the office complained of — the violations alleged are of rules no reasonable official could have thought permissible.

And qualified-immunity resolution is frequently premature at the pleading stage where the defense turns on disputed facts — here, most obviously, whether Plaintiff's recording was reviewed at all. Thompson v. Ragland, 23 F.4th at 1255 ("Because they turn on a fact-bound inquiry, qualified immunity defenses are typically resolved at . . . summary judgment"; a Rule 12(b)(6) qualified-immunity motion "subjects the defendant to a more challenging standard of review," under which "it is the defendant's conduct as alleged in the complaint that is scrutinized for constitutionality").

**CONCLUSION**

57. For the reasons stated, Defendants' Motion to Dismiss (ECF 52) should be denied. In the alternative, if the Court finds any pleading deficiency, Plaintiff respectfully requests leave to amend. Fed. R. Civ. P. 15(a)(2).

DATED this 13th day of September, 2026.

Respectfully submitted,

/s/ Timothy J. Christensen
Timothy J. Christensen
Plaintiff, pro se
10987 East Crestline Circle
Englewood, CO 80111
TJHVACRLLC@gmail.com
983-214-9249